BERRY *v.* UNITED STATES FIDELITY AND
GUARANTY COMPANY, ET AL.

[No. 113, September Term, 1967.]

* * *

JACKSON, ET UX. *v.* UNITED STATES FIDELITY
AND GUARANTY COMPANY, ET AL.

[No. 114, September Term, 1967.]

*Decided March 5, 1968.*

152

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES, McWILLIAMS and SINGLEY, JJ.

*Charles J. Josey* for appellants.

*W. Page Dame, Jr.,* for United States Fidelity and Guaranty Company, one of appellees; *William O. Doub* for Fidelity & Deposit Company of Maryland, other appellee.

SINGLEY, J., delivered the opinion of the Court.

These appeals had their genesis in a real estate transaction which took place on 21 March 1963, when the appellants, William M. Jackson and Ethel B. Jackson, sold their residence at 4919 Herring Run Drive to the appellant, Alice Berry. The sale was made under an installment contract which called for a down payment of $3,200.00 in cash. Between 6 February 1963 and 26 November 1963 the appellant Berry made payments totalling $3,819.46 to Carl A. Robinson, the president of Addison Realty Corporation, who had acted as agent for the Jacksons in the transaction. When it became apparent that Robinson had no intention of paying the sellers or of returning the payments to the buyer, both instituted suit in the Superior Court of Baltimore City against Robinson, Addison Realty Corporation, Travelers Indemnity Company (the Travelers), and Fidelity and Deposit Company of Maryland. The declarations were later amended to add New Amsterdam Casualty Company and United States Fidelity and Guaranty Company as additional defendants. Only Fidelity and Deposit Company of Maryland and United States Fidelity and Guaranty Company (the Surety Companies) are appellees in the case before us.

As a real estate broker, Robinson was required to have a license (Maryland Code [1964 Repl. Vol.] Art. 56, § 217[a]), and subsection (b) of § 217 made the providing of "a corporate bond in the sum of $5,000 * * * for the use and benefit of the public who may suffer or sustain any loss" a condition precedent to the granting of the license. In compliance with the statutory requirement, Robinson, on 10 May 1962, filed with the Maryland Real Estate Commission (the Commission) a real estate broker's bond in the amount of $5,000 written by

Travelers Indemnity Company on the form required by the Commission [1] for the period 1 May 1962 to 30 April 1963.

For some unexplained reason, Robinson also obtained similar bonds, on the Commission's form, each in the amount of $5,000.00, and effective from 1 May 1962 to 30 April 1963, from each of the Surety Companies. These bonds were delivered to Robinson, but never filed by him with the Commission. It was this circumstance which caused the Surety Companies to be joined as defendants in the suits.

In their agreed statement of facts, permitted by Maryland Rule 828 g, the parties stipulated that "[c]laims by Appellants against Robinson arise out of transactions by Appellants with Robinson as a Real Estate Broker during the license year May 1, 1962 until April 30, 1963" and we accept this stipulation as controlling for the purposes of this opinion.

The lower court granted motions for summary judgments filed by each of the Surety Companies. The present appeal was taken from these orders.

The Surety Companies contend that the Code required one bond, in the amount of $5,000.00; that this requirement was met by Robinson on 10 May 1962, when he filed the Travelers' bond with the Commission; and that since the bonds respectively issued by the Surety Companies were never filed, the delivery and acceptance required to create a binding obligation between the Surety Companies and the creditor were lacking. In support of the contention that delivery and acceptance are essential to give operative effect to a contract of suretyship they cite *McShain, Inc. v. Eagle Indemnity Co.,* 180 Md. 202, 23 A. 2d 669 (1942) ; *State v. Gaver,* 115 Md. 250, 80 A. 891 (1911) ; *Harris v. Regester & Son,* 70 Md. 109, 16 A. 386 (1889) ; *State v. Jarrett,* 17 Md. 309 (1861) ; *Brown v. Murdock,* 16 Md. 521 (1861) ; *Burgess v. Lloyd,* 7 Md. 178, 200-02 (1854) ; Annot., 77 A.L.R. 1479 (1932) ; Stearns, *The Law of Suretyship,* § 2.2 at 9 (5th Ed., 1951). Of the cases cited, all involve official bonds except *McShain,* which dealt with a contractor's bond, the bond having been returned by the principal to the surety for a revision which the surety declined to make.

---

1. The Commission's form makes the State of Maryland the obligee of the bond.

The principle asserted by the Surety Companies is peculiarly applicable to official bonds. *Burgess v. Lloyd, supra; Brown v. Murdock, supra; State v. Jarrett, supra.* It was controlling in the case of Travelers, which wrote the bond filed by Robinson with the Commission to satisfy the requirement which had to be met if Robinson were to get his license.

The bonds written by Fidelity and Deposit and United States Fidelity and Guaranty were of a different character, however. While written on the form prescribed by the Commission, they were never filed with it, and the issuance of Robinson's license was not predicated on them. It is entirely possible that delivery was completed when they were handed to Robinson, to be used for such purposes as he might elect.

> "A suretyship agreement ordinarily, as in the case of other written instruments, acquires no force until it is completed by delivery. It is not considered to be delivered until it has passed beyond the dominion, control and authority of the surety and is no longer subject to his recall. Delivery by an agent is satisfactory and the principal may act as the surety's agent for such purpose. In fact, in the absence of any restriction in the instrument itself, the principal has implied authority to deliver the surety's contract." Stearns, *supra,* § 2.9 at 20-21.

Perhaps it could be argued that Robinson acted as agent of the Surety Companies in making delivery to himself as agent of the creditor. 43 Am. Jur., Public Officers, § 395 at 173-74; *cf. Edelin v. Sanders,* 8 Md. 118, 130 (1855); *Brown v. Murdock,* 16 Md. 521 (1861). We need not reach this point, however.

In a sense, the bonds written by the Surety Companies, not having been filed with the Commission, and being in the aggregate in excess of the penal sum required by the statute, were voluntary bonds, enforceable at common law. *Moses v. United States,* 166 U. S. 571, 41 L. Ed. 1119, 17 S. Ct. 682 (1897); 43 Am. Jur., Public Officers, § 411 at 183. It appears that the premiums had been paid and that the bonds, although they remained in Robinson's possession, exposed the Surety Com-

panies to hazards no greater than would have been involved had the bonds been lodged with the Commission.

The *Restatement of Security* (1941) deals with the problem in § 170 at 474, *Voluntary Bonds*:

> "Where there is no statutory requirement of an official bond but a public officer voluntarily furnishes a bond, the surety is liable on a bond given under seal or for which there is consideration."

and continues in Comment a, at 475:

> "If an officer voluntarily obtains a surety bond protecting government or others from losses due to his defaults, and pays the surety a premium for undertaking such an obligation, government and others, if named or designated in the contract, may have a right against the surety as third party beneficiaries. Here too the surety is primarily an indemnitor, though to the extent that he is liable for defaults for which the officer can be held, he is also a surety."

Comment b, at 475-76, continues:

> "b. *Voluntary furnishing of excessive bond.* When an officer and his surety voluntarily execute an official bond with a penalty in excess of the requirement, they are bound on their undertaking, see § 169. In such case there is consideration for the bond as an entirety. To avoid liability on the bond as executed, they must have some reason for claiming that their liability varies from that which they have voluntarily assumed. If the undertaking arises from their own choice, they have no defense."

In our view, the case at bar comes within the Restatement Rule. We do not intend to abrogate the rule of the Maryland cases that delivery, or delivery and acceptance, is required for an official bond or a contract bond to be operative. When Robinson filed the Travelers' bond with the Commission, this test was met.

The bonds issued by Fidelity and Deposit and United States Fidelity and Guaranty, although on the Commission's form, were not official bonds, and aggregated a penal sum in excess of the statutory requirement. These were voluntary bonds, which under the circumstances took on the aspect of contracts of indemnity. As such, no more proof of delivery to the obligee or of delivery to and acceptance by the creditor is required than is required in the case of any insurance contract intended to protect third persons, but only proof that the bonds were issued and were beyond the dominion, control and authority of the Surety Companies. This happened when they were delivered to Robinson. In reaching this determination, we are not unmindful of the results reached in *Harris v. Regester & Son, supra,* which held that delivery was necessary for a voluntary bond to become effective, and in *State v. Gaver, supra,* but prefer to follow the contrary result reached in *McLuckie v. Williams,* 68 Md. 262, 12 A. 1 (1888) where recovery was permitted on a voluntary bond, although there had obviously been no delivery.

There was a clear split of authority among the earlier cases which dealt with voluntary or excessive bonds. Some held that a statutory bond which did not strictly follow prescribed directions was wholly void. Others held that since the statutory provision was merely directory, a bond not strictly in accordance with statute was voluntary, to be construed like any other obligation at common law. A third group of cases held valid that part of the bond which conformed to the statute, and held the rest void. A definitive list of these authorities can be found in *Philadelphia v. Shallcross,* 14 Phila. 135, 136 (Pa. 1879).

As the individual surety of the nineteenth century was supplanted by the corporate surety, the modern concepts of the law of suretyship evolved rapidly.

> "Because of the often repeated adjuration that the surety is a favorite of the law, some confusion has arisen as to the manner in which suretyship agreements are to be construed. As we have seen, the early suretyship cases treated the contract as one of great burden to the surety, because of the fact that it was usually

made for accommodation only, and without any participation in the benefits of the principal contract. These reasons gave rise to a line of decisions strictly construing the suretyship contract in favor of the surety, following the legal doctrine of *"strictissimi juris."* Although the rule is still applied where an uncompensated surety is involved, the courts generally have abandoned it as to a paid surety and, indeed, tend to construe such a surety's contract in favor of the obligee. A paid surety which is a surety or bonding company is usually considered to be in the same class as an insurance company, its contract being held to be in the nature of insurance and to be construed according to the rules applicable to insurance contracts." Stearns, *supra,* § 2.4 at 11-13.

To the same effect, see *Women's Hospital v. Fid. & Guar. Co.,* 177 Md. 615, 618-19, 11 A. 2d 457 (1940).

The later cases appear to support the Restatement view that a voluntary or excessive bond is enforceable in accordance with its terms. *Aetna Casualty & Surety Co. v. People,* 72 F. 2d 452 (7 Cir. 1934); *State v. Taylor,* 10 S. D. 182, 72 N. W. 407 (1897).

In the *Taylor* case, which forms the basis of *Restatement of Security,* § 169, comment b, illustration 5, the state treasurer of South Dakota, required by statute to give bond in the penal sum of $250,000, voluntarily provided a $350,000 bond. When the state moved for a directed verdict for $344,277.45, the amount of Taylor's defalcations, the sureties objected on the theory that their maximum liability was $250,000, the amount of the statutory requirement. The court held that the bond, though not in conformity with the statute, was made in pursuance of its provisions, and was a valid and binding obligation to the extent of the penalty named in it.

*Taylor* relied on *Bank of Brighton v. Smith,* 5 Allen 413 (Mass. 1862) which held, at 415:

"The rule of law is well settled, that a bond given for the faithful performance of official duties, or in pursuance of some requirement of law, may be valid

and binding on the parties, although not made with the formalities or executed in the mode provided by the statute under which it purports to have been given. This rule rests on the principle that, although the instrument may not conform to the special provisions of a statute or regulation in compliance with which the parties executed it, nevertheless it is a contract voluntarily entered into upon a sufficient consideration, for a purpose not contrary to law, and therefore it is obligatory on the parties to it in like manner as any other contract or agreement is held valid at common law. [Citing cases.]"

Judge Bryan, speaking for our predecessors in *McLuckie v. Williams, supra,* described a voluntary bond, 68 Md. at 264, 12 A. at 2:

"The bond, though not effective to maintain an attachment, is not illegal; it is not forbidden by statute, nor does it contravene any principle of morality or public policy. It is simply a voluntary obligation; the act and deed of the obligors by which they declare themselves to be held and firmly bound. * * * A bond not required by any statute, and not being in such form, and containing such terms as to accomplish the expectations and purposes of its makers, will, if not impeachable in other respects, nevertheless stand as their act and deed. Obligors have always been held liable on their voluntary bonds, and ought to be so held."

Since we adhere to this view, it follows that it was error for the court below to have granted the Surety Companies' motions for summary judgment.

*Orders reversed and cases remanded, costs to be paid by appellees.*